UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
MAHESH SHARMA,                          :
                                        :
                  Plaintiff,            :
                                        :
     -against-                          :    03 Civ. 9427 (DAB) (THK)
                                        :
                                        :    **REPORT AND RECOMMENDATION**
NEW OPAL CORP., ARUN VADHAN,            :
JASHAVANTRAI GORADIA, and               :
DIMPY, INC.,                            :
                                        :
                  Defendants.           :
-----------------------------------X

**TO: HON. DEBORAH A. BATTS, United States District Judge.**
**FROM: THEODORE H. KATZ, United States Magistrate Judge.**

     Plaintiff, Mahesh Sharma, was employed as an assistant chef in
the Manhattan branch of a restaurant doing business as Dimple
Indian Cuisine ("Dimple").  Plaintiff brings this action against
New Opal Corporation ("New Opal"), Arun Vadhan, Jashavantrai
Goradia, and Dimpy, Inc. alleging violations of the Fair Labor
Standards Act, 29 U.S.C. §§ 201 - 219 (the "FLSA"), and New York
Labor Law ("NYLL").

     Presently before the Court is Plaintiff's motion for summary
judgment, brought pursuant to Rule 56 of the Federal Rules of Civil
Procedure, against New Opal, Arun Vadhan, and Jashavantrai Goradia
(collectively, "Defendants").[1]  The motion was referred to this
Court for a Report and Recommendation, pursuant to 28 U.S.C. §
636(b)(1)(B) and (C).  For the reasons set forth below, this Court

_____

     [1] A default judgment was entered against the fourth named
Defendant, Dimpy, Inc., on August 25, 2005. (See Order and
Judgment, dated Aug. 25, 2005 ("Dimpy Default Judgment").)

recommends that Plaintiff's motion be granted with respect to (1) Plaintiff's status as an employee; (2) New Opal's and Goradia's status as employers; and (3) Goradia's successor liability. The Court further recommends that Plaintiff's motion be denied in all other respects.

## BACKGROUND

The following material facts are undisputed unless otherwise indicated. Plaintiff was employed as an assistant chef at Dimple, an Indian restaurant in Manhattan, from July 2000 through February 2003.

I. <u>Ownership and Management of Dimple During Plaintiff's Employment</u>

From July 2000 until April 2001, Dimple was owned by Defendant New Opal. (<u>See</u> Response of Defendants to Plaintiff's Statement of Material Facts ("Defs.' 56.1 Resp."), ¶ 1.) New Opal's sole activity has been to operate Dimple or sublease the restaurant to another corporation. (<u>See</u> Plaintiff's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1 Stmt."), ¶ 12.) Defendant Vadhan made an initial investment of $26,000 in New Opal. (<u>See</u> <u>id.</u> ¶ 13.) The company has only two corporate officers: Vadhan, who is New Opal's President, and Yousaf Wilson, New Opal's Vice President. (<u>See</u> <u>id.</u> ¶ 3.)[2] When Vadhan and Wilson set up New Opal

_____

[2] Plaintiff released Wilson, who was originally named as a defendant, from the present suit because of concerns that Wilson's bankruptcy filing would delay this litigation. (<u>See</u> Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."), at 2-3.)

d/b/a Dimple, their agreement was that Wilson would run the day-to-day operation of the restaurant, and then share any profits with Vadhan. (<u>See</u> Deposition of Arun Vadhan, dated May 2, 2005 ("Arun Vadhan Dep. I"), attached as Exhibit ("Ex.") C to Declaration of Mayra Peters-Quintero, dated Jan. 30, 2006 ("Peters-Quintero Aff."), at 33.)

The Parties dispute who exactly controlled Dimple during the period covering the Spring of 2001 until February 2003. In April 2001, Wilson formed another corporation, Jasy Inc. ("Jasy"). (<u>See</u> Pl.'s 56.1 Stmt. ¶ 38.) According to Vadhan, he told Wilson to form Jasy for the purpose of running Dimple, because Vadhan did not want any of the "responsibility, liabilities, or anything like that" relating to the restaurant. (<u>See</u> <u>id.</u> ¶ 37.) In a letter dated May 15, 2001, Dimple's insurance agent requested that the name on the restaurant's insurance policy be changed to Jasy, explaining "[t]hey have added a new partner Wilson B. Yousef [sic] (old manager of the business). Other financial interest remains the same." (<u>Id.</u> ¶ 39.)

Plaintiff alleges that even though Wilson took over the management of Dimple in 2001, Vadhan, as New Opal's President, continued to act as Dimple's ultimate decision-maker. (<u>See</u> Pl.'s Mem. at 3.) During the period of August 2001 to December 2002, Jasy made regular payments, ranging for $2000 to $6000, to New Opal. (<u>See</u> Pl.'s 56.1 Stmt. ¶¶ 40-41.) Dimple's lease retained New

Opal's name, and the restaurant's phone and utility bills remained in Vadhan's name during this period. (See id. ¶¶ 42-44.) According to Defendants, Wilson, as co-owner and manager of Dimple, not Vadhan, was responsible at all times for the terms and conditions of Plaintiff's employment. (See Affidavit of Yousaf B. Wilson, dated Jan. 25, 2005 ("Wilson Aff."), attached as Ex. 1 to Declaration of Gerald J. McMahon in Opposition to Plaintiff's Motion for Summary Judgment, dated Mar. 14, 2006 ("McMahon Decl."), ¶ 7.)[3]

In early 2003, Defendant Goradia, who is Vadhan's father-in-law, assumed management of Dimple. (See Pl.'s 56.1 Stmt. ¶ 47.) Goradia incorporated Dimpy Inc. in February 2003, and is Dimpy's

---

[3] Plaintiff argues in his Reply that the Court should disregard Wilson's affidavit, because Plaintiff was unable to take Wilson's deposition. (See Plaintiff's Reply Memorandum of Law, dated Mar. 24, 2006 ("Pl.'s Reply Mem."), at 7-8.) The Court declines to do so. Last July, Plaintiff wrote to the Court explaining that he had been unable to schedule Wilson's deposition, because Wilson was out of the country. (See Memorandum Endorsed Letter, dated July, 13, 2005.) The Court issued a Memorandum Endorsed Order on the letter stating, "In view of the fact that Mr. Wilson is out of the country, it is apparent that his deposition cannot take place prior to the discovery deadline. His attorney shall promptly notify Plaintiff's counsel and the Court upon his return to the United States." (See id. at 2.) Plaintiff did not bring the matter to the Court's attention again. Plaintiff chose to offensively file this motion for summary judgment on all of his claims without taking Wilson's deposition or moving to reopen discovery. This is not a case where Plaintiff requires Wilson's deposition to defend against a motion for summary judgment seeking to dismiss his claims, in which case a stay of this motion in order to take Wilson's deposition, if he were available, might be justified. Moreover, there is no indication that Wilson has returned to the United States.

President. (See id. ¶¶ 4-5.)  On February 1, 2003, Vadhan and
Goradia, on behalf of their respective corporations, signed a
sublease agreement, which provided that New Opal would lease the
restaurant to Dimpy until January 31, 2005. (See id. ¶ 51.)  In a
letter to Dimple's insurance carrier on February 14, 2003, Wilson
and Goradia requested that the insurance policy be changed to
identify Dimpy, Inc. as the insured, explaining that Goradia had
been taken on as a partner. (See id. ¶ 55.)  The letter assured the
insurance carrier that "all operations remain the same." (See id.)
After the February 2003 change in management, the restaurant
retained the same name and continued to serve the same food. (See
id. ¶¶ 53-54.)

II. Plaintiff's Employment at Dimple

Plaintiff and Defendants paint starkly different pictures of
Plaintiff's employment at Dimple.  Plaintiff claims that he began
working at Dimple on July 11, 2000 as an assistant chef. (See
Affidavit of Mahesh Sharma, dated Jan. 25, 2006 ("Sharma Aff."),
attached as Ex. I to Peters-Quintero Aff., ¶ 1.)  Plaintiff worked
diligently in this capacity — opening the restaurant, preparing
and cooking for the restaurant and large, off-site catered events,
supervising the staff and operations of the kitchen, cleaning and
preparing the kitchen for the next day, and closing down the
restaurant at the end of the day. (See id. ¶¶ 8-11.)  According to
Plaintiff, he consistently worked six to seven days per week from

approximately 8:30 A.M. until 10:00 P.M. or later. (See id. ¶¶ 11, 13, 15.) Plaintiff claims to have worked an average of 94.5 hours per week from July 2000 until November 2000, and then 81 hours per week until February 2003. (See id. ¶¶ 13-15.) During this two and a half year period, Plaintiff only missed three and a half days of work to attend his son's graduation, and to have an emergency tooth extraction. (See id. ¶ 17.)

Plaintiff alleges he was not paid for his first week of work. (See id. ¶ 12.) Defendants allegedly advised Plaintiff that Dimple policy required retaining an employee's first week's salary as a security deposit. (See id.) Plaintiff then received $425 for his second week of work, and continued to be paid at the rate of $425 per week through November 2000. (See id. ¶ 14.) In November 2000, Plaintiff received a raise to $450 per week. (See id. ¶ 15.) The restaurant stopped paying Plaintiff's weekly salary completely in late January 2003. (See id. ¶ 24.) After working for three weeks without receiving a paycheck, Plaintiff quit on February 18, 2003. (See id. ¶ 27.)

Defendants deny that Plaintiff worked as an assistant chef at Dimple, instead characterizing him as a member of the kitchen staff, working under the direction of Wilson and Dimple's chef, Mannan Motiayan. (See Wilson Aff. ¶ 2.) Defendants contend that Plaintiff worked only thirty-five to forty hours per week, and was paid in cash at Plaintiff's request. (See id. ¶ 6.) Defendants

have not come forward with any records of Plaintiff's hours or wages, such as time sheets or attendance records. Finally, Defendants deny that Plaintiff's resignation was due to their failure to pay him. (See id. ¶ 2.)

III. Plaintiff's Allegations of Fraud

In March 2001, Plaintiff alleges that Motiayan, the restaurant's chef, to whom Plaintiff reported, pressured Plaintiff to loan him $2000 on behalf of Dimple. (See Sharma Aff. ¶¶ 6, 19.) Motiayan requested the loan because Dimple was purportedly having financial problems, and needed the money to prevent employees, like Plaintiff, from losing their jobs. (See id. ¶ 19.) Plaintiff lent Motiayan the money, but Motiayan only repaid $1000 to Plaintiff. (See id. ¶¶ 20-21.)

Defendants deny that this incident occurred. As evidence to support this assertion, Defendants cite only to portions of Motiayan's deposition in which Motiayan's attorney objected on Fifth Amendment grounds to nearly all questions regarding the alleged loan. (See Deposition of Alagu Mannan Motiayan, dated Feb. 10, 2005 ("Motiayan Dep."), attached as Ex. EE to Peters-Quintero Aff., at 48-49.)

Plaintiff also claims that Defendants falsely promised that Dimple would sponsor Plaintiff's employment-based visa. In 2001, Wilson referred Plaintiff to Wilson's attorney to begin the process of obtaining a visa. (See Pl.'s 56.1 Stmt. ¶ 77.) In conjunction

with his labor certification application, Plaintiff paid $1,995 in legal fees. (See Sharma Aff. ¶ 23.) Plaintiff expected that once his labor certification was approved, Dimple would complete the process of applying for a visa for him. (See id. ¶ 29.) Plaintiff's labor certification was approved by the New York State Department of Labor on February 27, 2003, but Defendants replaced Plaintiff's name on the labor certification, using it instead to apply for a visa for Goradia's son. (See Pl.'s 56.1 Stmt. ¶ 80-82; Deposition of Arun Vadhan, dated May 6, 2005 ("Arun Vadhan Dep. II"), attached as Ex. D to Peters-Quintero Aff., at 135:5-18.)

Defendants admit that Wilson attempted to help Plaintiff with his immigration documentation by bringing him to Wilson's attorney (see Wilson Aff. ¶ 4), and acknowledge that Plaintiff paid almost $2000 in legal fees in conjunction with his labor certification application (see Defs.' 56.1 Resp. ¶ 77). However, Defendants point out that Plaintiff left his employment at Dimple before his labor certification was approved. (See Wilson Aff. ¶ 5.) Therefore, they transferred the approved labor certificate to Goradia's son, because Plaintiff was no longer employed at Dimple, and their attempts to locate Plaintiff had failed. (See Deposition of Arun Vadhan, dated May 6, 2005 ("Arun Vadhan Dep. III"), attached as Exhibit 5 to McMahon Decl., at 135; Pl.'s 56.1 Stmt. ¶ 80-82.)

Plaintiff asks the Court to grant summary judgment on the

following issues: (1) Plaintiff's status as an "employee" and
Defendants' status as Plaintiff's "employers" under the FLSA and
NYLL; (2) Defendants' liability for failure to pay Plaintiff the
required federal minimum wage and overtime under the FLSA, and
minimum wage, overtime, and spread of hours under NYLL; (3)
Defendants' liability for damages under the common-law doctrines of
quantum meruit and unjust enrichment, based on Defendants' failure
to pay Plaintiff the reasonable value of his labor; and (4)
Defendants' liability on Plaintiff's two common-law fraud claims.

**DISCUSSION**

I.  Summary Judgment Standards

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is entitled
to a judgment as a matter of law." See Fed. R. Civ. P. 56(c); see
also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct.
2548, 2552-53 (1986).  The burden of demonstrating the absence of
any genuine dispute as to material facts rests upon the party
seeking summary judgment. See Adickes v. S. H. Kress & Co., 398
U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970).

Once a properly supported motion for summary judgment has been
made, the nonmoving party must put forth "specific facts showing
there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Summary judgment is not appropriate if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party. See Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986), and "may not rest upon mere allegations and denials of the adverse party's pleadings," Fed. R. Civ. P. 56(e). In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the parties against whom summary judgment is sought - in this case, Defendants. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

## II.  Individual Liability under the FLSA and NYLL

Defendants do not dispute Plaintiff's status as an "employee" under the FLSA and NYLL. Nor do Defendants challenge Plaintiff's contention that New Opal or Goradia qualify as Plaintiff's "employer" for purposes of both statutes. Rather, Defendants argue that there are issues of material fact as to whether Vadhan may be found personally liable as Plaintiff's employer.

-----

A. <u>Legal Standards</u>

"Individuals may be held personally liable as employers under both the FLSA and NYLL for wage and hours violations." <u>Gilliam v. Addicts Rehabilitation Ctr. Fund</u>, No. 05 Civ. 3452 (RJH) (RLE), 2006 WL 1049352, at *2 (Apr. 19, 2006).  The FLSA defines "employee," with certain exceptions not relevant here, as "any individual employed by an employer." <u>See</u> 29 U.S.C. § 203(e)(1).  An "employer" for purposes of the FLSA is "any person acting directly or indirectly in the interest of an employer in relation to an employee." <u>See</u> <u>id.</u> at § 203(d).  "The Supreme Court has emphasized the 'expansiveness' of the FLSA's definition of employer," <u>Herman v. RSR Sec. Servs. Ltd.</u>, 172 F.3d 132, 139 (2d Cir. 1999) (citing <u>Falk v. Brennan</u>, 414 U.S. 190, 195, 94 S. Ct. 427, -- (1973)), and FLSA regulations recognize that an individual may have more than one employer, <u>see</u> <u>Zheng v. Liberty Apparel Co.</u>, 355 F.3d 61, 66 (2d Cir. 2003).

The NYLL includes definitions of "employer" and "employee" that are equally broad. <u>See</u> <u>Jankowski v. Castaldi</u>, No. 01 CV 0164 (SJF) (KAM), 2006 WL 118973, at *8 (E.D.N.Y. Jan. 13, 2006); <u>Ansoumana v. Gristede's Operating Corp.</u>, 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2003).[4]  "Most courts agree that the test for determining

---

[4] Overtime compensation and spread of hours claims for restaurant employees are brought pursuant to 12 NYCRR §§ 137-1.3 and 137-1.7, and are governed by the definitions set out in 12 NYCRR § 137-3.2.  Section 137-3.2 defines an "employee" as "any individual permitted to work by an employer in the restaurant

whether an entity or person is an 'employer' under New York law is
the same as the test . . . for analyzing employer status under the
[FLSA]." <u>Chung v. New Silver Palace Restaurant</u>, 272 F. Supp. 2d
314, 319 n.6 (S.D.N.Y. July 14, 2003); <u>see also</u> <u>Chan v. Triple 8
Palace, Inc.</u>, No. 03 Civ. 6048 (GEL), 2006 WL 851749, at *15
(S.D.N.Y. Mar. 30, 2006) ("The test for determining whether an
individual qualifies as an 'employer' is the same under FLSA and
New York Labor Law."); <u>Ansoumana</u>, 255 F. Supp. 2d at 189 (using
federal law to decide joint employer liability under New York law
and the FLSA); <u>Lopez v. Silverman</u>, 14 F. Supp. 2d 405, 411 n.4
(S.D.N.Y. 1998) (considering federal law exclusively in resolving
the issue of whether defendants were employers for purpose of
overtime claims under federal and New York law).  Therefore, the
Court will evaluate individual liability in this action using the
FLSA standard.

Because the FLSA defines "employer" in such broad terms, it
provides little guidance on whether a given individual should be
considered an employer.  <u>See</u> <u>Herman</u>, 172 F.3d at 139.  In
determining employer status, "the overarching concern is whether

---

industry," subject to exceptions not applicable here.  Minimum
wage claims under NYLL § 652(1) are governed by the definitions
in NYLL § 651. <u>See</u> <u>Zheng</u>, 355 F.3d at 78.  Section 651(5) defines
an employee as "any individual employed or permitted to work by
an employer in any occupation," subject to certain exemptions.
An "employer" includes "any individual, partnership, association,
corporation . . . or any organized group of persons acting as an
employer." NYLL § 651(6).

the alleged employer possessed the power to control the worker[] in question, with an eye to the 'economic reality' presented by the facts of each case." Herman, 172 F.3d at 139 (citations omitted); see also Zheng, 355 F.3d at 66 (noting that an entity "suffers or permits" an individual to work if, as a matter of "economic reality," the entity functions as the individual's employer) (citing Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33, 81 S. Ct. 933, -- (1961)); Carter v. Dutchess Comm. College, 735 F.2d 8, 12 (2d Cir. 1984) ("It is common ground that courts, in determining whether an employment relationship exists for the purposes of the FLSA, must evaluate the 'economic reality' of the relationship.").

⎯⎯⎯⎯⎯The "economic reality" test considers whether the alleged employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." See Herman, 172 F.3d at 139 (quoting Carter, 735 F.2d at 12); see also Gilliam, 2006 WL 1049352, at *2; Jankowski, 2006 WL 118973, at *8; Doo Nam Yang v. ACBL Corp., No. 04 Civ. 8987 (LBS), 2005 WL 3312000, at *10 (S.D.N.Y. Dec. 5, 2005).[5] None of these factors standing alone is

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[5] The Second Circuit has articulated several versions of the FLSA "economic reality" test for employer liability. See e.g, Zheng, 355 F.3d at 61 (applying six-factor test drawn from Rutherford Food Corp. v. McComb, 331 U.S. 722, 724-25, 730, 67 S. Ct. 1473, 1473 (1947)), to evaluate whether garment workers were

dispositive. _Herman_, 172 F.3d at 139 (citing _Superior Care_, 840 F.2d at 1059); _Gilliam_, 2006 WL 1049352, at *2. The economic reality test is evaluated in light of the totality of the circumstances. _See_ _Herman_, 172 F.3d at 139. A court may examine any relevant evidence, and consider other factors that bear on the alleged relationship. _See_ _Zheng_, 355 F.3d at 68; _Herman_, 172 F.3d at 139.

    B. Defendant Vadhan

Applying the _Carter_ economic reality test, the Court must decide whether Vadhan can be considered an employer under the FLSA. The first _Carter_ factor looks at whether the alleged employer had the power to hire and fire employees. To demonstrate Vadhan's authority to hire and fire employees, Plaintiff points to three job advertisements from March 9, 10, and 11, 2001 for Indian cooks

---

employed by the garment manufacturers, in addition to their direct employers, who worked for the manufacturers as "jobbers"); _Brock v. Superior Care_, 840 F.2d 1054, 1058-59 (2d Cir. 1988) (utilizing five-factor test to evaluate whether nurses were employees of health care service rather than independent contractors); _Carter_, 735 F.2d at 12 (using four-factor test to determine whether an inmate conducting tutorial classes in a community college program was employed by the college). The _Zheng_ factors are targeted at finding joint employer liability, and the _Superior Care_ factors focus on distinguishing employees from independent contracts. Thus, the economic reality of who is an employer in the present case is most accurately assessed using the _Carter_ factors, which the Second Circuit most recently employed in _Herman_, 172 F.3d at 139. Other district courts within the Second Circuit have also applied the _Carter_ factors post-_Zheng_ in evaluating whether individual owners, shareholders or officers should be viewed as employers under the FLSA. _See_ _e.g._, _Gilliam_, 2006 WL 1049352, at *2; _Jankowski_, 2006 WL 118973, at *8.

appearing in the Daily News. (See Job Advertisements, Daily News, Mar. 9-11, 2001, attached as Ex. N to Peters-Quintero Decl.) Each of these ads lists "A. Vadhan" as the hiring contact. (See id.) Plaintiff does not point to any evidence of Vadhan's direct hiring of employees. Nor does Plaintiff contend that he himself was hired by Vadhan; rather, Wilson affirmed that he hired Plaintiff to work in the kitchen at Dimple. (See Wilson Aff. ¶ 2.) Plaintiff instead argues that Vadhan had the power to determine high-level changes in the restaurant's management. (See Pl.'s Mem. at 10.) The Second Circuit has held that hiring mainly managerial staff is still a strong indication of control. See Herman, 172 F.3d at 140. Vadhan testified that Wilson consulted him in the beginning of 2003 about transferring management of the restaurant to someone else. (See Arun Vadhan Dep. II at 106:12-107:21.) Vadhan then approved transferring management of the restaurant to his father-in-law, Goradia. (See id.)

The second Carter factor assesses whether the alleged employer controlled the conditions of employment. Status as an employer does not require continuous monitoring of employees. See Herman, 172 F.3d at 139. Rather, "[c]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since the limitations on control 'do not diminish the significance of its existence.'" See id. (citations omitted).

Plaintiff has not presented any evidence that Vadhan controlled the conditions of employment at Dimple. Defendants contend that Wilson managed the day-to-day operation of the restaurant, and controlled employee work schedules and conditions of employment. (See Defs.' Mem. at 4.) Vadhan and Wilson set up Dimple so that Wilson ran the restaurant, and then distributed profits to Vadhan. (See Arun Vadhan Dep. I at 33:8-13.) Wilson affirmed that as co-owner and manager, he supervised Plaintiff specifically, and was solely responsible for the terms and conditions of Plaintiff's employment. (See Wilson Aff. ¶ 7.) Vadhan only visited the restaurant, at the most, every three months or so. (See Deposition of Arun Vadhan, dated May 2, 2005 ("Arun Vadhan Dep. IV"), attached as Ex. 4 to McMahon Decl., at 42:9-13.) In addition, Plaintiff himself testified that he gave the information required for his labor certification application directly to Wilson. (See Deposition of Mahesh Sharma, dated Feb. 16, 2005, attached as Ex. 3 to McMahon Decl., at 206:14-15.)

The third and fourth Carter factors focus on whether Vadhan determined rates and method of payment, and maintained employment records. As already noted, Defendants contend that Wilson ran the day-to-day operation of the restaurant and controlled the operation. (See Wilson Aff. ¶ 7; Arun Vadhan Dep. IV at 15-16.) Plaintiff has presented no evidence suggesting that Vadhan set the rates of pay of Dimple restaurant staff or that he was involved in

maintaining employment records.  The only evidence Plaintiff offers

on this subject is that Vadhan opened a bank account for New Opal,

for which both Vadhan and Wilson were authorized signers. (See

Pl.'s 56.1 Stmt. ¶¶ 35-36.)  Even so, Plaintiff admits Vadhan did

not distribute paychecks, and does not point to any instances of

Vadhan signing employee paychecks.

Because the economic reality test is evaluated in light of the

totality of the circumstances, the Court may consider other factors

it deems relevant to determining employer status.  Plaintiff's

Memorandum devotes a substantial amount of time to Vadhan's

involvement in opening the restaurant.  Plaintiff interprets this

as an indication of Vadhan's determining the physical conditions of

Plaintiff's employment. (See Pl.'s Mem. at 11.)  Plaintiff also

views Vadhan's position as President of New Opal as indicating

Vadhan was responsible for the general operation of the restaurant

and its finances, as evidenced by the restaurant's utility and

phone bills bearing Vadhan's name. (See id. at 13.)

Finally, Plaintiff highlights Vadhan's signing of employees'

labor certification applications as President on behalf of "New

Opal Corp. d/b/a Dimple."  Specifically, in April 2001, Vadhan

signed the "Declaration of Employer" for Plaintiff's labor

certification application. (See Application for Alien Employment

Certification for Mahesh Sharma, dated Apr. 20, 2001 ("Sharma

Employment Cert. App."), attached as Ex. O to Peters-Quintero

Decl., at 3.)  Vadhan also signed other documents in connection
with Plaintiff's labor certification application. (See Letter from
Vadhan to New York State Department of Labor, dated Apr. 16, 2001,
attached as Ex. O to Peters-Quintero Decl., at 11; INS Form G-28,
dated Feb. 15, 2001, attached as Ex. O to Peters-Quintero Decl., at
12.)  In addition, Vadhan signed legal documents related to the
labor certification applications of other Dimple employees. (See
Application for Alien Employment Certification for Hasmukhben
Parekh, dated Apr. 19, 2001, attached as Ex. P to Peters-Quintero
Decl., at 4; Immigrant Petition for Alien Worker, dated Mar. 1,
2002, attached as Ex. P to Peters-Quintero Decl., at 13;
Application for Alien Employment Certification for Jal Irani, dated
Apr. 25, 2001, attached as Ex. Q to Peters-Quintero Decl., at 4.)

Plaintiff correctly notes that Vadhan signed the labor
applications of Irani and Parekh after the date on which he claims
to have no longer been involved with Dimple.  However, Vadhan
testified that he simply signed blank forms at the request of
Wilson.  (See Deposition of Arun Vadhan, dated May 6, 2005,
attached as Ex. 5 to McMahon Decl., at 124:23-126:4.)  Wilson
allegedly asked Vadhan to sign the forms, explaining that Jasy
could not sponsor the applications because it was a new
corporation. (See id.)

In this case, the analysis under the Carter factors only
weakly suggests that Vadhan's role in Dimple should be viewed as

18

one of an employer, since only the first <u>Carter</u> factor indicates employer status. Under the totality of the circumstances, however, the evidence more strongly suggests that Vadhan may not have been the hands-off investor and President in-name-alone that Defendants try to portray him as. However, this is not enough to demonstrate as a matter of law that Vadhan should be viewed as an employer, rather than as an initial promoter of New Opal who fulfilled his duties as New Opal's President. Drawing all reasonable inferences favorable to Defendants as the non-moving parties, the Court finds that there are material issues of fact as to whether Vadhan in reality exercised the requisite control over working conditions at Dimple. <u>Cf.</u> <u>Jankowski</u>, 2006 WL 118973, at *8 (granting summary judgment for Defendant as to FLSA claims against individual defendant where plaintiffs did not offer sufficient evidence that individual defendant participated in operating the business); <u>Chao v. Vidtape, Inc.</u>, 196 F. Supp. 2d 281, 291 (E.D.N.Y. 2002) (holding that company-owner's father, who managed another corporation located on the same premises, who most employees thought was the "boss," and who occasionally gave orders and attended meetings, was not an employer for FLSA purposes, because he did not play an integral role in company's operations or set conditions of employment); <u>compare</u> <u>Herman</u>, 172 F.3d at 140-41 (concluding that chairman and 50% owner of security company qualified as employer where he had direct involvement in company operations, exercised

19

financial control, and gave instructions to and received reports from the company's manager); U.S. Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 778 (6th Cir. 1995) (finding individual defendant, who was president and 50% owner of restaurant, and who ran the business, controlled employment records, and determined the restaurant's employment practices, an employer within the meaning of the FLSA); Lopez v. Silverman, 14 F. Supp. 2d at 412 (finding individual, who was manufacturing company's founder, president and sole shareholder, liable as an employer, where the record showed that he personally oversaw manufacturing operations on a daily basis, made all business decisions, and engaged in the hiring, firing, and salary setting for all employees).

   B. Defendant Goradia

   In his Memorandum, Plaintiff asks the Court to grant summary judgment on: (1) Goradia's employer status during the final weeks of Plaintiff's employment, once Goradia took over management of Dimple in February 2003, and (2) Goradia's successorship liability as President of Dimpy for FLSA and NYLL violations that occurred throughout the duration of Plaintiff's employment. Defendants' Memorandum does not address Plaintiff's request for summary judgment on these issues.

   At his deposition, Goradia asserted his Fifth Amendment privilege on nearly all questions, including those inquiring about his involvement with Dimpy, and his involvement in or knowledge of

anything related to Plaintiff's employment or Dimple restaurant. (See Pl.'s Mem. at 16; Pl.'s 56.1 Stmt. ¶ 57.) Because this is a civil proceeding, an adverse inference may be drawn at trial from Goradia's assertion of his Fifth Amendment privilege. See LiButti v. United States, 107 F.3d 110, 124-25 (2d Cir. 1997). However, the Court declines drawing an adverse inference against Goradia at the summary judgment stage, where all reasonable inferences must be drawn for the non-moving party. See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber, 407 F.3d 34, 55 (2d Cir. 2005) ("Even assuming that a jury might draw [an adverse inference on the basis of Fifth Amendment privilege], however, we are required at summary judgment to draw all reasonable inferences in favor of the non-moving party . . . Doing so, we cannot conclude that [a non-party's] silence resolves all genuine issues of fact on the question."); see also In re Marrama, No. 05-1858, 2006 WL 1028771, at *3 (1st Cir. Apr. 20, 2006) (refusing to draw an adverse inference from a party's invocation of Fifth Amendment privilege for purposes of summary judgment in bankruptcy proceeding). Even though Goradia was silent during his deposition, Plaintiff still bears the burden of showing that there are no issues of material facts as to Goradia's status as an employer and as a successor to New Opal, and that Plaintiff is entitled to judgment as a matter of law. See United States v. Certain Real Prop. and Premises Known as

21

<u>4003-4005 5th Ave.</u>, 55 F.3d 78, 83 (2d Cir. 1995) (noting that an invocation of the Fifth Amendment is not a substitute for relevant evidence and does not alter a party's evidentiary burden).

Nevertheless, Defendants admit the material facts set out in Plaintiff's 56.1 Statement relating to Goradia's involvement with Dimpy. (<u>See</u> Pl.'s 56.1 Stmt. ¶¶ 47-56; Defs.' 56.1 Resp. ¶¶ 47-56.) As of February 1, 2003, Goradia, as President of Dimpy, signed a sublease agreement, which provided that New Opal would lease the restaurant to Dimpy until January 31, 2005. (<u>See</u> Pl.'s 56.1 Stmt. ¶¶ 5, 51; Defs.' 56.1 Resp. ¶ 51.)  Dimpy assumed responsibility for the rent and the expenses related to the restaurant. (<u>See</u> Pl.'s 56.1 Stmt. ¶ 52; Defs.' 56.1 Resp. ¶ 52.)  Defendants admit that Goradia took over operational control of the restaurant as of this date (<u>see</u> Pl.'s 56.1 Stmt. ¶ 52; Defs.' 56.1 Resp. ¶ 52.), and Vadhan testified that his father-in-law runs the restaurant (<u>see</u> Arun Vadhan Dep. II at 107:22-24).  Defendants further admit that, as of May 2005, Goradia continued to manage the restaurant.  (<u>See</u> Pl.'s 56.1 Stmt. ¶ 56; Defs.' 56.1 Resp. ¶ 56.)  This evidence is sufficient as a matter of law to demonstrate that Goradia exercised control over the workers and conditions of employment at Dimple. Thus, the Court concludes that summary judgment should be granted on the issue of Goradia's individual liability as of February 1, 2003. <u>Cf.</u> <u>Ansoumana</u>, 255 F. Supp. 2d at 192 (granting summary judgment for plaintiffs as to personal liability under the FLSA

where both individual defendants were founders, owners, and sole shareholders, and defendants personally oversaw operation of companies on a daily basis); Lopez, 14 F. Supp. at 413 (holding that the record demonstrated that individual defendant, who was president and sole shareholder of company, had a sufficiently dominant role in the company's daily operations to warrant individual liability for FLSA obligations).

Having determined that Goradia may be held personally liable as an employer, it is necessary to address whether Goradia should be held liable as a successor employer for FLSA and NYLL violations by New Opal. The FLSA does not address whether liability may be passed on to a successor employer, see Steinbach v. Hubbard, 51 F.3d 843, 845 (9th Cir. 1995), and the Second Circuit has not decided whether successorship liability exists under the FLSA. The few federal courts that have considered the issue have analogized it to other employment law statutes, such as Title VII and the NLRA, to which successorship principles have been applied. See id.; Brock v. LaGrange Equipment Co., No. CV 86-0-170, 1987 WL 39105, at *1 (D. Neb. July 14, 1987); see also Carlton v. Interfaith Medical Ctr., 612 F. Supp. 118, 121 n.2 (E.D.N.Y. 1985) (denying summary judgment on successor liability under the Equal Pay Act of the FLSA). These courts have concluded that successorship liability is appropriate under the FLSA given the statute's remedial purpose. See Steinbach, 51 F.3d at 845; Brock, 1987 WL 39105, at *1; see

also <u>Usery v. Broadway Inn, Inc.</u>, No. 76 CV 231-C, 1978 WL 1700, at
*2-3 (W.D. Mo. June 9, 1978)).  This Court agrees.

Successor liability under federal employee rights statutes is
evaluated using federal common law successorship doctrine.  In
<u>Steinbach</u>, the Ninth Circuit borrowed the standards for
successorship liability from the National Labor Relations Act (the
"NLRA") to evaluate successorship liability under the FLSA.  <u>See</u>
<u>Steinbach</u>, 51 F.3d at 845; <u>see also</u> <u>Brock</u>, 1987 WL 39105, at *1
(looking to labor context for successorship liability standard).
The NLRA approach focuses on whether the new company, "'has
acquired substantial assets of its predecessor and continued,
without interruption or substantial change, the predecessor's
business operations.'" <u>Fall River Dyeing & Finishing Corp. v. NLRB</u>,
482 U.S. 27, 43, 107 S. Ct. 2225, 2236 (1987) (quoting <u>Golden State</u>
<u>Bottling Co. v. NLRB</u>, 414 U.S. 168, 184, 94 S. Ct. 414, 425
(1973)).  The key inquiry is whether there is a substantial
continuity between the two companies. <u>See</u> <u>Fall River Dyeing</u>, 482
U.S. at 43, 107 S. Ct. at 2236.  Factors relevant to the inquiry
include "whether the business of both employers is essentially the
same; whether the employees of the new company are doing the same
jobs in the same working conditions under the same supervisors; and
whether the new entity has the same production process, produces
the same products, and basically has the same body of customers."

Id.[6]  This is a fact specific inquiry, and must be considered in light of the facts in each case. See id.; Carlton, 612 F. Supp. at 121 n.2.[7]

Whether Goradia can be viewed as a successor employer turns on whether there was a substantial continuity between New Opal's Dimple and Dimpy's version of the restaurant.  Significantly, Dimpy

---

[6] It could also be argued that courts should look to the federal common-law articulation of successorship liability as applied in the Title VII context. In EEOC v. Barney Skanska Const., Co., No. 99 Civ. 2001 (DC), 2000 WL 1617008, at *2 (S.D.N.Y. 2000), the court applied a nine-factor successorship test first developed by the Sixth Circuit in EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1094 (6th Cir. 1974). "These factors are: (1) whether the successor company had notice of the charge; (2) the predecessor's ability to provide relief; (3) whether there has been substantial continuity of business operations; (4) whether the successor uses the same facility; (5) whether the successor uses the same or substantially the same work force; (6) whether the successor uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether the successor uses the same machinery, equipment, and methods of production; and (9) whether the successor produces the same product." Barney Skanska Const. Co., 2000 WL 1617008, at *2. Although articulated differently, the NLRA test clearly encompasses most of the elements of the Title VII successorship standard.

[7] Under New York Law, an asset purchaser is not ordinarily liable for the seller's debts. See Cargo Partners AG v. Albatrans, Inc., 352 F.3d 41, 45 (2d Cir. 2003). "New York law recognizes four common law exceptions to the rule that an asset purchaser is not liable for the seller's debts, applying to: (1) a buyer who formally assumes a seller's debts; (2) transactions undertaken to defraud creditors; (3) a buyer who defacto merged with the seller; and (4) a buyer that is a mere continuation of a seller." Cargo Partners, 352 F.3d at 45 (citing Schumacher v. Richards Shear Co., 59 N.Y.2d 239, 244 (1983)). If Plaintiff were able to satisfy the federal common law's substantial continuity standard, this showing would also appear to demonstrate successor liability under New York's "mere continuation" exception.

twice failed to produce a representative for deposition in this action. As a result, this Court ordered, <u>inter alia</u>, that Dimpy's Answer be stricken and that all facts alleged in the Second Amended Complaint relating to Dimpy be taken as established. (<u>See</u> Order and Report and Recommendation, dated August 5, 2005.) The Court also recommended that a default judgment be entered against Dimpy, leaving Plaintiff's damages as the sole issue to be determined. (<u>See</u> <u>id.</u>) The District Court adopted the Report and Recommendation on August 25, 2005, and ordered a default judgment entered against Dimpy. (<u>See</u> Dimpy Default Judgment.)

Thus, the facts alleged in Plaintiff's Second Amended Complaint about Dimpy are taken as established for the purpose of the present motion. In his Second Amended Complaint, Plaintiff alleged,

> [T]he current Dimple is a mere continuance of its predecessor, as . . . Dimpy, Inc. ha[s] substantially continued the business of its predecessor, by using the same name; using the same or substantially the same supervisory personnel, equipment, and facilities; using the same or substantially the same workforce; and producing the same or substantially the same goods as its predecessors.

(<u>See</u> Second Amended Complaint and Jury Demand, dated Jan. 18, 2005, ¶ 13.) Defendants also make the following admissions in their 56.1 Response: (1) Dimpy assumed control of Dimple in February 2003 by virtue of a sublease; (2) a letter to Dimple's insurance carrier, which requested that the policy for Dimple be transferred to Dimpy, represented that "all operations remain the same"; and (3) the

restaurant retained the same name and continued to serve the same food after Dimpy took control of Dimple in February 2003. (See Pl.'s 56.1 Stmt. ¶¶ 47, 51, 53-55; Defs.' 56.1 Resp. ¶¶ 47, 51, 53-55.)

Finally, Defendants have failed to respond to Plaintiff's successor liability argument. The Court construes this failure to respond as a concession of Goradia's successor liability. See Wilson v. Hendel, No. 00 Civ. 6458 (CJS), 2005 WL 775902, at *4 (W.D.N.Y. Apr. 6, 2005) (construing defendants' failure to reply to an argument raised in plaintiff's summary judgment opposition brief as conceding plaintiff's point); Martin v. Westport, 329 F. Supp. 2d 318, 325 (D. Conn. 2004) (construing plaintiff's failure to address Title VII liability in his brief opposing summary judgment as a concession that defendant was not subject to liability under Title VII); Bastys v. Rothschild, No. 97 Civ. 5154 (CM), 2000 WL 1810107, at *32 (S.D.N.Y. Nov. 21, 2000) (holding that the plaintiff conceded defendant's argument by not responding to the point in plaintiff's memorandum of law opposing summary judgment); Frangipane v. Dow Corning Corp., No. 95 Civ. 6214 (RPP), 1998 WL 142354, at *4 (S.D.N.Y. Mar. 27, 1998) (concluding that the plaintiff had conceded that she could not state a claim for fraud, because of her failure to respond to arguments in defendants' motion for summary judgment).

Based on the established facts in the Second Amended

Complaint, the facts admitted by Defendants, and Defendants' failure to respond to this aspect of Plaintiff's motion, the Court concludes that a substantial continuity exists between Dimple as operated by New Opal, and Dimple under the control of Dimpy. Plaintiff is therefore entitled to summary judgment with respect to Goradia's successor liability. The restaurant operated by Dimpy was a continuation of New Opal's Dimple, operating in the same location, with the same name and menu, with substantially the same staff, and using the same facilities and methods of operation.

In sum, the Court recommends that Plaintiff's motion for summary judgment be granted as to (1) Plaintiff's status as an employee; (2) New Opal's and Goradia's status as employers; and (3) Goradia's liability as a successor employer. Plaintiff's motion for summary judgment as to Vadhan's personal liability as an employer should be denied.

III. <u>FLSA and NYLL Violations</u>

Both the FLSA and New York law mandate that employees be paid a legally-prescribed minimum hourly wage, which was $5.15 per hour during the period covered by this litigation. <u>See</u> 29 U.S.C. § 206(a)(1); 12 NYCRR § 137-1.2; <u>see also</u> <u>Chan</u>, 2006 WL 851749, at *3. The NYLL also provides that employers must pay an additional rate for spread of hours, which entitles an employee to "one hour's pay at the basic minimum hourly wage" on each day that the workday lasts over ten hours. <u>See</u> 12 NYCRR §§ 137-1.7, 137-3.11; <u>Doo Nam</u>

<u>Yang</u>, 2005 WL 3312000, at *7.

In addition, "The FLSA and New York state labor laws entitle employees to time-and-a-half overtime for hours worked in excess of forty hours per week." <u>Noble v. 93 Univ. Place Corp.</u>, 303 F. Supp. 2d 365, 376 (S.D.N.Y. 2003) (citing 29 U.S.C. § 207(a)(1) and 12 NYCRR § 142-2.2); <u>see also</u> 12 NYCRR 137-1.3.[8]  Under the FLSA, employees are entitled to overtime compensation equal to one and one-half times the employee's "regular rate." <u>See</u> <u>Grochowski v. Phoenix Const.</u>, 318 F.3d 80, 87 (2d Cir. 2003) (quoting 29 U.S.C. § 207(a)(1)); <u>see also</u> <u>Singh v. City of N.Y.</u>, 418 F. Supp. 2d 390, 396 (S.D.N.Y. 2005).  The FLSA does not expressly define "regular rate" of pay, but the Supreme Court has determined that it is "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." <u>Grochowski</u>, 318 F.3d at 87 (citing <u>Walling v. Youngerman  Reynolds Hardwood Co.</u>, 325 U.S. 419, 424, 65 S. Ct. 1242, 1245 (1945)).

Plaintiff alleges that Defendants violated the FLSA and NYLL by failing to pay Plaintiff the required minimum wage, overtime compensation, and spread of hours to which he was entitled. Relying on his own affidavit and deposition, Plaintiff contends that from approximately July 18, 2000 until November 2000,

---

[8] New York overtime regulations generally incorporate the overtime requirements of the FLSA. <u>See</u> <u>Mendez v. Radec Corp.</u>, 232 F.R.D. 78, 89 (W.D.N.Y. 2005); <u>see also</u> <u>Bennett v. Progressive Corp.</u>, 225 F. Supp. 2d 190, 215 (N.D.N.Y. 2002) (applying federal law to overtime claims brought under the FLSA and NYLL).

Plaintiff typically worked 94.5 hours per week at a weekly rate of $425. (See Sharma Aff. ¶¶ 13-14.) Then, for the period covering November 2000 until January 24, 2003, Plaintiff worked an average of 81 hours per week at a weekly rate of $450. (See id. ¶¶ 15.) Finally, for the first week of Plaintiff's employment in July 2000 and the last three weeks of his employment in February 2003, Plaintiff worked approximately 364 hours for which he was never paid. (See id. ¶¶ 12-13, 24, 27; Deposition of Mahash Sharma, dated Feb. 16, 2005, attached as Ex. M to Peters-Quintero Decl., at 142:7-16.) Under applicable minimum wage, overtime, and spread of hours provisions, Plaintiff calculates that he should have been paid a minimum of $633 per week during the first period when he worked 94.5 hour weeks, and $554 per week during the second period. (See Pl.'s Mem. at 19.) In total, Plaintiff alleges that he is owed $23,016 in unpaid wages. (See id. at 20.)

In response, Defendants deny that Plaintiff ever worked any overtime. According to Wilson, Plaintiff only worked thirty-five to forty hours per week. (See Wilson Aff. ¶ 6.) Defendants offer the sworn affidavit of a Dimple employee to corroborate Wilson's account that Plaintiff never worked overtime. (See Affidavit of Nita Chudanasma, dated Mar. 11, 2006 ("Chudanasma Aff."), attached as Ex. 2 to McMahon Aff., ¶ 3) ("One of my co-workers was a man named Mahesh Sharma, who worked as a kitchen helper. During the time that I worked at the restaurant, Sharma never worked more than

35 hours a week.".)[9]  Defendants also point to Plaintiff's labor

---

[9] Defendants did not disclose Chudanasma as an individual "likely to have discoverable information relevant to disputed facts" in their initial disclosures pursuant to Rule 26(a) of the Federal Rules of Civil Procedure.  Plaintiff argues in his Reply that Defendants should be precluded from relying on Chudanasma's affidavit in defending against Plaintiff's motion. (See Pl.'s Reply Mem. at 7.)  As Defendants did not file a Surreply, Defendants have not had an opportunity to explain why Chudanasma's name was not disclosed.  A party that fails to comply with Rule 26 is subject to Rule 37's provision that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c)(1).  In considering whether a failure to disclose is harmless, the Second Circuit considers the following factors: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Softel, Inc. v. Dragon Med. and Sci. Commc'ns, Inc., 118 F.3d 955, 961 (2d Cir. 1997). The only prejudice raised by Plaintiff is his failure to subpoena Chudanasma for deposition. (See Pl.'s Reply Mem. at 7.) Considering the above factors, the Court will not preclude the affidavit.  The relevant portions of the affidavit only corroborate other evidence offered by Defendants, and it is not relied upon exclusively to create any issues of material fact. See Davis v. U.S. Bancorp,  383 F.3d 761, 765 (8th Cir. 2004) (holding that district court did not abuse Rule 37 discretion by denying motion to strike an affidavit of a loan officer, whose name was not included in defendant's Rule 26(a) disclosures, where affidavit was used to support motion for summary judgment); Phillips v. City of Victoria, No. Civ.A. V-03-38, 2006 WL 840402, at *5 (S.D. Tex. Mar. 30, 2006) (refusing to exclude affidavit of coworker offered by plaintiff in response to motion for summary judgment where coworker's name was not disclosed under Rule 26); Walker v. Norris Cylinder Co., No. 3:03 CV 1009 D, 2005 WL 2278080, at *8 (N.D. Tex. Sept. 19, 2005) (allowing plaintiff to use affidavit of coworker not listed in Rule 26(a) initial disclosures in response to defendant's motion for summary judgment); CSC Holdings, Inc. v. Berube, No. 01-1650 (DRH) (MLO), 2004 WL 3541331, at *1 (E.D.N.Y. July 7, 2004) (considering plaintiff's wife's affidavit, which only corroborated the essential facts of the case and shed no new light on issues, even

certification application, which was signed by Plaintiff, and states that he worked thirty-five hours per week. (See Sharma Employment Cert. App. at 2-5.) According to Defendants, Plaintiff was earning more than minimum wage, given his weekly salary of $425 to $450 per week, and thus, has no valid claim for unpaid wages. (See Defs.' Mem. at 6.)

Neither Plaintiff or Defendants have presented the Court with any records of Plaintiff's wages or hours. The FLSA makes it the employer's responsibility to create and preserve records of an employee's wages and hours. See Doo Nam Yang, 2005 WL 3312000, at *1 (citing 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2); Tlacoapa v. Carregal, 386 F. Supp. 2d 362, 367 (S.D.N.Y. 2005). Ordinarily, it is the plaintiff's burden under the FLSA of showing that work was performed for which the employee was not properly compensated. See Tlacoapa, 386 F. Supp. 2d at 369. However, where a defendant does not keep proper payroll documentation concerning wages and hours, a plaintiff's burden of proof is lowered. See Jankowski, 2006 WL 118973, at *5. When an employer has failed to keep accurate records,

an employee has carried out his burden if he proves that

_____

though wife was not listed in Rule 26(a) disclosures). However, the Court expresses no opinion as to whether Chudanasma should be excluded as a witness if Defendants attempt to call her at trial. Assuming Defendants had a legitimate reason for their omission of Chudanasma for their Rule 26(a) disclosures, Plaintiff, at a minimum, should be given an opportunity to depose her.

> he has in fact performed work for which he was improperly
> compensated and if he produces sufficient evidence to
> show the amount and extent of that work as a matter of
> just and reasonable inference.  The burden then shifts to
> the employer to come forward with evidence of the precise
> amount of work performed or with evidence to negative the
> reasonableness of the inference to be drawn from the
> employee's evidence.

Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-688, 66 S.

Ct. 1187, 1192 (1946); see also Reich v. S. New England Telecomm.

Corp., 121 F.3d 58, 66-67 (2d Cir. 1997) (same).  Therefore, when

an employer has not kept such records, an employee suing for lost

wages need only "'submit sufficient evidence from which violations

of the Act and the amount of an award may be reasonably inferred.'"

Reich, 121 F.3d at 66 (citation omitted).  New York law

incorporates a similar standard. See Doo Nam Yang, 2005 WL 3312000,

at *1.

Even though Plaintiff's burden is lessened by Defendants'

failure to produce records of Plaintiff's actual wages and hours

worked, the Court is unable to grant summary judgment based on the

evidence presented by Plaintiff.  Defendants have come forward with

affidavits and other evidence starkly contradicting Plaintiff's

account of the hours for which he is owed compensation.  Wilson and

Chudanasma swore in their affidavits that Plaintiff never worked

more than forty hours per week, and Plaintiff signed a labor

certification application stating that he worked thirty-five hours

per week. (See Wilson Aff. ¶ 6; Chudanasma Aff. ¶ 3; Sharma

Employment Cert. App. at 2-5.)  This evidence creates issues of

material fact as to the hours worked by Plaintiff, and whether Plaintiff was adequately compensated under the FLSA's and NYLL's minimum wage, overtime and spread of hours provisions during his employment at Dimple. <u>Cf.</u> <u>Singh</u>, 418 F. Supp. 2d at 401 (holding that factual disputes could not be resolved on summary judgment where factual questions existed as to how many hours plaintiffs worked, whether the time was required as part of employment, and whether defendants had knowledge of such overtime); <u>Gonzalez v. Rite Aid, Inc.</u>, 199 F. Supp. 2d 122, 134 (S.D.N.Y. 2002) (holding that conflict in evidence needed to be resolved at trial where employee presented declarations and deposition testimony that he worked significant overtime for which he was unpaid, but employer claimed the hours worked were exorbitant and unbelievable). Thus, the Court recommends that Plaintiff's motion for summary judgment as to Defendants' liability for unpaid wages under the FLSA and NYLL be denied.

IV. <u>Quantum Meruit and Unjust Enrichment Claims</u>

Plaintiff also seeks summary judgment with respect to Defendants' liability under the quasi-contract theories of <u>quantum meruit</u> and unjust enrichment. Plaintiff seeks recovery for the weeks in which he allegedly received no compensation. Plaintiff is also requesting the reasonable value of the hours worked from July 2000 until January 2003, for which he feels did not receive adequate compensation. (<u>See</u> Pl.'s Mem. at 20-21.) Defendants do

not address these claims in their Memorandum, but Defendants' 56.1 Response completely denies Plaintiff's valuation of his labor. (See Defs.' 56.1 Resp. ¶¶ 73-76.)

Applying New York law, the Second Circuit has analyzed quantum meruit and unjust enrichment together as a single quasi-contract claim. See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005); see also Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 663 (2d Cir. 1996). This may be done because unjust enrichment is a required element of a quasi-contract, and quantum meruit is one measure of liability for the breach of such a contract. See Mid-Hudson Catskill, 418 F.3d at 175 (citations omitted).

To establish a claim for quantum meruit under New York law, a plaintiff must show: (1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they were rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of those services. See Mid-Hudson Catskill, 418 F.3d at 175; Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d Cir. 2000); Bongat v. Fairview Care Ctr., Inc., 341 F. Supp. 2d 181, 188 (E.D.N.Y. 2004).[10]

---

[10] The elements of unjust enrichment under New York law require a plaintiff to establish that: (1) defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) the circumstances are such that equity and good conscience require restitution. See Derven v. PH Consulting, Inc., No. 05 Civ. 2290 (CM) (MDF), 2006 WL 959813, at *7 (S.D.N.Y. Apr. 7, 2006) (citing Lake Minewaska Mountain Houses, Inc., v. Rekis, 259

Plaintiff, as an at-will employee, may pursue <u>quantum</u> <u>meruit</u> recovery in the absence of an employment contract. <u>See</u> <u>Longo v. Shore & Reich, Ltd.</u>, 25 F.3d 94, 98 (2d Cir. 1994). However, Plaintiff appears to be seeking summary judgment only as to Defendants' liability based on <u>quantum</u> <u>meruit</u>, rather than damages. (<u>See</u> Pl.'s Mem. at 20.) But these two inquiries are intertwined, because a determination of the reasonable value of Plaintiff's services requires a finding that such services were rendered. <u>See</u> <u>Topo v. Dhir</u>, No. 01 Civ. 10881 (PKC), 2004 WL 527051, at *4 (S.D.N.Y. 2004). Moreover, "'the question of whether a party had a reasonable expectation of compensation for services rendered is a matter for the trier of fact to determine based on the evidence before it.'" <u>See</u> <u>Guggenheimer</u>, 810 N.Y.S.2d at 888 (quoting <u>Moors v. Hall</u>, 143 A.D.2d 336, 338, 532 N.Y.S.2d 412, 414 (2d Dep't 1988)); <u>Topo v. Dhir</u>, 2004 WL 527051, at *4 (same).

Plaintiff claims that there were approximately four weeks for which he received no compensation, and that for the weeks he was paid, he did not receive the reasonable value of his labor. Defendants deny that there were any weeks in which Plaintiff was not paid, and argue that Plaintiff's $425 - $450 weekly salary compensated Plaintiff at considerably more than minimum wage for his thirty-five to forty hour per week schedule. (<u>See</u> Defs' Mem. at

---

A.D.2d 797, 798, 686 N.Y.S.2d 186, 188 (3d Dep't 1999)); <u>Bongat</u>, 341 F. Supp. 2d at 188; <u>Guggenheimer v. Bernstein Litowitz Berger & Grossman, LLP</u>, 810 N.Y.S.2d 880, 888 (N.Y. Sup. Ct. 2006).

6; Defs' 56.1 Resp. ¶¶ 64, 68-69; Wilson Aff. ¶¶ 5-6.) Thus, Plaintiff's quasi-contract claims for <u>quantum</u> <u>meruit</u> and unjust enrichment may not properly be disposed of upon summary judgment, because Defendants' affidavits starkly challenge Plaintiff's version of what services he rendered. <u>Cf.</u> <u>Longo</u>, 25 F.3d at 98 (reversing grant of summary judgment for employer on <u>quantum</u> <u>meruit</u> claim, and noting that the reasonable value of employee's services was a determination for the factfinder); <u>Derven</u>, 2006 WL 959813, at *7 (denying motion for summary judgment where claim for unjust enrichment was predicated on unresolved questions of material fact concerning the parties' dealings). As such, the Court recommends that Plaintiff's motion for summary judgment on his <u>quantum</u> <u>meruit</u> and unjust enrichment claims be denied.

V. <u>Plaintiff's Fraud Claims</u>

To state a claim of fraud under New York law, a plaintiff must demonstrate: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." <u>Wynn v. AC Rochester</u>, 273 F.3d 153, 156 (2d Cir. 2001); <u>Newbro v. Freed</u>, 409 F. Supp. 2d 386, 400 (S.D.N.Y. 2006); <u>see also</u> <u>Lama Holding Co. v. Smith Barney Inc.</u>, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80 (1996). In determining whether a plaintiff reasonably relied on a material misrepresentation, a court

considers "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." <u>Emergent Capital Inv. Mgmt. v. Stonepath Group</u>, 343 F.3d 189, 195 (2d Cir. 2003). Fraud claims must be proven by clear and convincing evidence, <u>see</u> <u>Dallas Aerospace, Inc. v. CIS Air Corp.</u>, 352 F.3d 775, 784-85 (2d Cir. 2003), and must be pleaded with specificity, <u>see</u> Fed. R. Civ. P. 9(b).

A. <u>Plaintiff's Visa Application</u>

Plaintiff claims that Defendants defrauded Plaintiff by falsely promising him that Dimple would sponsor Plaintiff's employment-based visa. (<u>See</u> Pl.'s Mem. at 23; Sharma Aff. ¶ 22.) Plaintiff contends that Defendants promised to sponsor Plaintiff's labor certification in order to induce Plaintiff to continue working at the restaurant, and Plaintiff reasonably relied on this promise and continued working at Dimple despite the abuses he suffered. (<u>See</u> Pl.'s Mem. at 23.) As a result of Defendants' transfer of the approved certification to a relative, Plaintiff suffered damages in the form of the approximately $2000 he spent on legal fees during the application process. (<u>See</u> <u>id.</u> at 24; Sharma Aff. ¶ 23.)

Defendants do not address Plaintiff's allegation in their Memorandum, but deny Plaintiff's version of events in their Rule 56.1 Response, citing to Wilson's affidavit and Vadhan's deposition

testimony. (See Defs.' 56.1 Resp. ¶¶ 77, 79, 81, 84-85.) According to Defendants, Plaintiff resigned from his employment at Dimple before his labor certification was approved. (See Wilson Aff. ¶ 5.) Therefore, Defendants transferred the approved labor certificate to Goradia's son, because Plaintiff was no longer employed at Dimple, and they were unable to contact Plaintiff. (See Arun Vadhan Dep. III at 135; Defs.' 56.1 Resp. ¶¶ 80-82). Thus, the facts set out by Defendants imply that they intended to sponsor Plaintiff for his visa, but were unable to do so because of Plaintiff's decision to leave Dimple. Because a fact-finder could conclude, based on the evidence, that Defendants' representations about sponsoring Plaintiff's labor certification were made in good faith, and did not constitute fraud, summary judgment on this issue should be denied. Cf. Banque Nationale De Paris v. Prudential Sec., Inc., No. 95 Civ. 0990 (DC), 1997 WL 639257, at *2 (S.D.N.Y. Oct. 16, 1997) (denying plaintiff's motion for summary judgment on fraud claim where record created material issue of fact as to defendant's fraudulent intent); Progressive Image Gruppe, Inc. v. 162 Charles St. Owners, Inc., 272 A.D.2d 66, 67, 707 N.Y.S.2d 98, 99 (1st Dep't 2000) (denying plaintiff's motion for summary judgment on whether plaintiff was defrauded into entering a lease because of issues of fact as to whether defendant made a specific representation, and whether the plaintiff's reliance was reasonable); Muller v. Hannon, 223 A.D.2d 693, 694, 637 N.Y.S.2d 433, 434 (2nd Dep't 1996)

(denying plaintiff's motion for summary judgment on fraud claim where documents relied on by the plaintiff did not conclusively prove that the defendant fraudulently misrepresented herself).

B.  <u>Plaintiff's Loan to Motiayan</u>

Plaintiff alleges that Defendants intentionally defrauded him when Dimple's chef, Motiayan, obtained a $2000 loan from Plaintiff, of which $1000 remains unpaid, for the purported purpose of saving Dimple from financial difficulties.  Yet, Plaintiff has not named Motiayan as a defendant in this action.

Defendants do not address this allegation of fraud in their Memorandum, but summarily deny in their 56.1 Response that this incident occurred. (<u>See</u> Defs.' 56.1 Resp. ¶¶ 86-92.)  Defendants do not cite to any competent evidence in their 56.1 Response to refute Plaintiff's allegations.  Therefore, the key issue on summary judgment is whether Plaintiff has offered sufficient evidence to establish as a matter of law that Defendants should be held vicariously liable for the chef's alleged fraud.

Plaintiff does not argue that Motiayan, as the restaurant's chef, had real or actual authority to solicit and accept loans on behalf of the restaurant.  <u>See</u> <u>Judith M. v. Sisters of Charity Hosp.</u>, 93 N.Y.2d 932, 933, 693 N.Y.S.2d 67, 68 (1999) ("The doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of the employment.").  Rather, Plaintiff argues that Motiayan's

fraudulent actions should be imputed to Dimple based on the doctrine of apparent authority. (See Pl.'s Mem. at 23-23.)

Federal common law and New York State law are consistent with respect to determining apparent authority based on agency relationships. See 36 Convent Ave. HDFC v. Fishman, No. 03 Civ. 3998 (JGK), 2004 WL 1048213, at *3 (S.D.N.Y. May 7, 2004). A principal may be bound by the actions of an agent on the basis of apparent authority only where it is shown that a third party reasonably relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal. See Stichting, 407 F.3d at 56 (citing Hallock v. State, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513 (1984)); Indosuez Inter. Fin. B.V. v. Nat'l Reserve Bank, 98 N.Y.2d 238, 245-46, 746 N.Y.S.2d 631, 635-36 (2002). The words and conduct of the principal are critical to the creation of apparent authority. See Crigger, 2003 WL 22170607, at *13. The scope of apparent authority is defined by the principal's manifest acts, as an agent cannot create apparent authority in himself. See 36 Convent Ave., 2004 WL 1048213, at 3; see also Minskoff v. Amer. Exp. Travel Related Servs. Co., 98 F.3d 703, 708 (2d Cir. 1996) ("Apparent authority, then, is normally created through the words and conduct of the principal as they are interpreted by a third party, and cannot be established by the actions or representations of the agent."). The third party's reliance on the apparent authority of the agent must be reasonable

given the circumstances. See Crigger, 2003 WL 22170607, at *13.

Plaintiff argues that Motiayan's title as chef, and his position as Plaintiff's direct supervisor and a supervisory employee were enough to warrant Plaintiff's reliance on Motiayan's representations. However, Motiayan was merely the chef at the restaurant, not the manager or an owner. Plaintiff has not alleged that he or other Dimple employees were hired by Motiayan, or that Motiayan participated in any other aspects of management, other than supervising food preparation. Further, Plaintiff's allegations point solely to representations made by Motiayan. Plaintiff offers no evidence that Wilson, or any of the Defendants, said or did anything to convey that Motiayan had the authority to ask for a loan on behalf of Dimple.

Whether apparent authority exists is normally a question of fact, and inappropriate for resolution on a motion for summary judgment. See Paul T. Freund Corp. v. Commonwealth Packing Co., 288 F. Supp. 2d 357, 373 (W.D.N.Y. 2003); see also Hedeman v. Fairbanks, Morse & Co., 286 N.Y. 240, 248-49, 36 N.E.2d 129, 133 (1941) ("[W]here no written authority of the agent has been proven, questions of agency and of its nature and scope and of ratification by or estoppel of the principal . . . are questions of fact to be submitted to the jury."). Plaintiff's allegations are insufficient to prove apparent authority as a matter of law. Plaintiff has not demonstrated facts showing that Defendants held Motiayan out as

having either a financial stake in Dimple, a role in managing the business side of the restaurant, or authority to solicit loans from employees on behalf of Dimple's owners. Thus, Plaintiff is not entitled to summary judgment as to the alleged fraudulent loan, because Plaintiff has not established that Defendants are vicariously liable as a matter of law for Motiayan's actions. Cf. Crigger, 2003 WL 22170607, at *14 ("[T]he more basic question of whether [the account executive] was acting within the scope of his employment - thereby possibly obviating the need to determine whether apparent authority exists - is one for a jury to answer."); Dresser Indus., Inc. v. First Travel Corp., No. CIV-88-581E, 1989 WL 87599, at * 5 (W.D.N.Y. Aug. 2, 1989) (denying plaintiff's motion for summary judgment as to defendant's employee's apparent authority as to fraudulent billing, because questions of fact remained); Bertran Packing, Inc. v. Transworld Fabricators, Inc., 50 A.D.2d 542, 543, 375 N.Y.S.2d 335, 337 (1st Dep't 1975) (denying defendant summary judgment as to plaintiff company's founder's apparent authority to enter into a contract on behalf of plaintiff, because "the issue raised by plaintiff whether defendant knew or should of known of [founder's] lack of authority may not be concluded at this juncture").[11]

---

[11] The Court also perceives a potential issue of fact as to whether Plaintiff could have reasonably relied on Motiayan's representation that the restaurant would go out of business if it did not receive a $2000 loan from one its employees.

## CONCLUSION

For the reasons set forth above, this Court recommends that Plaintiff's motion for summary judgment be granted as to (1) Plaintiff's status as an employee; (2) the status of New Opal and Goradia as employers; and (3) Goradia's successor liability. The Court recommends denial of Plaintiff's motion in all other respects.

Pursuant to 28 U.S.C. 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and 6(e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Batts. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 149-52, 106 S. Ct. 466, 472-3 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

Respectfully Submitted,

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

44

Dated: May 24, 2006
       New York, New York

Copies mailed to:

Mayra Peters-Quintero, Esq.
Washington Square Legal Service
245 Sullivan Street, 6th Floor
New York, New York 10012

Krishnan Shanker Chittur
Chittur & Associates, P.C.
60 East 42nd Street
Suite 1501
New York, NY 10165

Gerald J. McMahon, Esq.
67 Wall Street, Suite 1810
New York, New York 10005